**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **EDWARD BOWLES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 1:11cv0050 TCM** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM AND ORDER**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Edward Bowles (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

**Procedural History**

Plaintiff applied for DIB and SSI in March 2005, alleging he was disabled as of August 2, 2003, by degenerative disc disease in his lower spine, right knee problems, a left

wrist injury, and depression. (R.[1] at 83-91.)  His applications were denied initially and after

a hearing held in June 2009 before Administrative Law Judge (ALJ) W. Gary Jewell.[2]  (Id.

at 7-22, 28-47, 50-51, 53-57.)  The Appeals Council denied Plaintiff's request for review,

effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-

3.)

## Testimony Before the ALJ

Plaintiff, appearing[3] without representation, testified at the administrative hearing.  His

wife, Beverly Bowles, was present but did not testify.

Plaintiff testified that, at the time of the hearing, he was 49 years old, 6 feet 4 inches

tall, and weighed 280 pounds, having gained approximately 40 pounds in the past four years.

(Id. at 33-34.)   He is married.  (Id. at 34.)  He completed the twelfth grade and has had no

further education and training.  (Id.)

Asked about his disability onset date in 2003 and his subsequent earnings, including

amounts in 2006 and 2007, Plaintiff testified that he had not worked since the beginning of

2008.  (Id. at 34-36.)  Asked what prevented him from working, Plaintiff explained that he

suffered from painful tingling radiating from his lower back to his legs and feet; he had

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

[2]Prior DIB and SSI applications also alleging a disability onset date of August 2, 2003, were denied in 2006 following a hearing at which a vocational expert testified in addition to Plaintiff, then represented by a non-attorney.  (See id. at 10, 40-48.)  The Appeals Council denied review of this decision.  (See id. at 10.)

[3]Plaintiff came in a wheelchair to the hearing.

- 2 -

broken a wrist a few years ago and had only five to seven percent use of it; and he had "busted up [his] right knee." (<u>Id.</u> at 36.)

The ALJ informed Plaintiff that he would be sent for physical and psychological consultative examinations, following which there would be another hearing unless the ALJ could then determine that Plaintiff's applications should be granted. (<u>Id.</u> at 37.)

<u>**Medical and Other Records Before the ALJ**</u>

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, various assessments and reports generated pursuant to Plaintiff's applications, and answers to interrogatories submitted by the ALJ to a vocational expert.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (<u>Id.</u> at 128-35.) He listed his height as 6 feet 4 inches tall and his weight as 265 pounds. (<u>Id.</u>) He is limited in his ability to work by lower lumbar disc disease, right knee problems, a left wrist injury, and depression. (<u>Id.</u> at 129.) These impairments prevent him from lifting anything heavier than ten pounds, bending, and stooping. (<u>Id.</u>) The impairments first bothered him on August 2, 2003, and prevented him form working that same day. (<u>Id.</u>) He had stopped working, however, on October 28, 2007, when his job ended. (<u>Id.</u>) His job then had been as a trapper for a boll weevil eradication service. (<u>Id.</u> at 130.) His medications include

Celebrex,[4] Lorazepam,[5] Neurontin,[6] OxyContin,[7] and Wellbutrin.[8]  (Id. at 133.)  All are prescribed by Dr. Robbins; none have any side effects.  (Id.)

Plaintiff reported on a Missouri Supplemental Questionnaire that pain in his lower back, legs, and feet prevent him from working.  (Id. at 150-57.)  Standing or sitting for long periods of time aggravate his pain.  (Id. at 150.)  His medications slow his reflexes and, sometimes, make him groggy.  (Id. at 151.)  He uses a wheelchair 30 percent of the time and a cane 70 percent.  (Id.)  Dr. Robbins advised him to do so.  (Id.)  He had added tub rails for assistance in getting in and out of his tub and hand rails for going in and out of his house.  (Id. at 152.)  With the exception of occasionally doing the laundry and taking out the trash, he does not do any household chores.  (Id. at 153.)  If he shops for longer than thirty minutes, he uses a wheelchair.  (Id.)  Sometimes, his pain prevents him from sleeping; sometimes, his wife has to help him dress.  (Id. at 154.)  He does not engage in any activities or hobbies.  (Id.)  He spends his day watching television or sleeping.  (Id.)  He can watch a thirty minute

---

[4]Celebrex is an anti-inflammatory prescribed for, among other things, pain relief.  Physicians' Desk Reference, 3073 (65th ed. 2011) (PDR).

[5]Lorazepam is a benzodiazepine used to treat anxiety disorders.  Drugs.com, Lorazepam, http://www.medilexicon.com/drugsearch.php?s=lorazepam&search (last visited Sept. 6, 2012).

[6]Neurontin is prescribed to treat neuropathic pain.  See mediLexicon, Neurontin (gabapentin), http://www.medilexicon.com/drugs/neurontin_783.php (last visited Sept. 6, 2012).

[7]"OxyContin is indicated for the management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."  PDR at 2880.  A total daily dose greater than 80 milligrams is "only for use in opioid-tolerant patients."  Id.  The PDR cautions that, because OxyContin contains oxycodone, a Schedule II controlled substance, it might be sought by a person with a substance abuse disorder.  Id. at 2883.  Indicative of such a disorder is "repeated 'loss' of prescriptions."  Id.

[8]Wellbutrin is prescribed for the treatment of major depressive disorder.  PDR at 1616.

television show but not a sixty minute show because he cannot sit or pay attention for long. (Id.)  When reading the newspaper, he does not see well and does not understand what he has read.  (Id.)  His wife does not want him to drive because he falls asleep at the wheel.  (Id. at 155.)  He has difficulties understanding and following instructions.  (Id. at 156.)

Plaintiff listed five jobs on a Work History Report.  (Id. at 136-47.)  From January to August 2003,[9] he had worked as an insurance salesman.  (Id. at 138.)  He did not describe the exertional requirements of this job.  (Id.)  An earnings report list annual reportable earnings of $21,482[10] in 2002; $16,085 in 2003; $3,126 in 2004; $7,629 in 2005; $9,624 in 2006; and $6,971 in 2007.  (Id. at 111.)

An agency employee noted that Plaintiff was a seasonal worker and that all work periods prior to October 28, 2007, were over the substantial gainful activity limit.  (Id. at 120, 124.)  Breaks in work prior to that date were not related to his disability.  (Id.)  When a case agent later inquired about his trapping work, Plaintiff explained that he was not on a time schedule when putting the traps in the fields, that his wife would help him because he would need to rest often; and he could not hold a steady job because there were days when he could not get out of bed.  (Id. at 172.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications.  (Id. at 177-83.)  Since he had completed the initial report, his pain had become

---

[9]During the remainder of 2003 and until October 2007, Plaintiff worked as a trapper for a boll weevil eradication service.  (See id. at 136.)

[10]All amounts are rounded to the nearest dollar.

so bad that his doctor had increased his daily dosage of OxyContin to 120 milligrams[11] and is monitoring his blood pressure.  (Id. at 178.)  His medications now include Aleve, Ativan,[12] Celebrex, Cymbalta,[13] Neurontin, OxyIR[14], OxyContin, and Tylenol Arthritis.  (Id. at 180.) None have any side effects.  (Id.)  His impairments do not affect his ability to care for his personal needs.  (Id. at 181.)  He spends most of his time in bed because the pain is too bad to do anything.  (Id.)

The medical records before the ALJ are (1) those considered pursuant to Plaintiff's earlier DIB and SSI applications; (2) the results of a 1997 MRI and of 2008 x-rays, and (3) office notes of Robert Robbins, Jr., D.O., or of the family nurse practitioner in Dr. Robbins' office.

The first category totals four pages and includes (1) the first page of the results of a 2002 magnetic resonance imaging (MRI) of Plaintiff's lumbar spine; (2) notes of his two office visits, one in March 2004 and one in June 2004, to Dr. Robbins for treatment of his back pain; (3) the first page of the results of a 2005 MRI of Plaintiff's right knee; and (4) the notes of a November 2005 visit to Brian C. Schafer, M.D., for treatment of a work-related right knee injury.  (Id. at 199-202.)  The lumbar spine MRI results revealed "[s]ome early loss

---

[11]See note 7, supra.

[12]Ativan is a benzodiazepine used to treat anxiety disorders.  Drugs.com, Ativan, http://www.medilexicon.com/drugsearch.php?s=Ativan&search (last visited Sept. 6, 2012).

[13]Cymbalta is prescribed for the treatment of major depressive disorder or generalized anxiety disorder.  PDR at 1758.

[14]OxyIR contains oxycodone hydrochloride, see note 7, supra, and are immediate release oral capsules.  See Opiates: OxyIR, http://www.opiates.com/OxyIR/ (last visited Sept. 6, 2012).

of disk height L5-S1 level with no focal or significant bony hypertrophic change" and mild transverse bugling of the disk annulus at the L4-5 level.  (Id. at 202.)  The MRI of Plaintiff's right knee revealed significant bone bruise and bone edema of the lateral femoral condyle and, to a lesser extent, of the lateral tibial condyle; a cortical fracture with minimal depression of the lateral femoral condyle; a minimal tear of the posterior horn of the lateral meniscus; and joint effusion.  (Id. at 200.)  Dr. Schafer expressed concern that Plaintiff's right knee was "taking an unusually long time to improve" given the objective medical findings.  (Id. at 199.) He was "concerned that there may be an element of some somatization[15] going on . . . ."  (Id.; footnote added.)

The second category includes a 1997 MRI of Plaintiff's lumbar spine and February 2008 x-rays.  The MRI revealed (1) degenerative disc disease narrowing and loss of disc signal at L5-S1; (2) some early loss of disc signal at L4-5; and (3) a small central discogenic bulge at L4-5 with no evidence of nerve root impingement.  (Id. at 237-38.)  The MRI was otherwise normal.  (Id. at 238.)  An x-ray of Plaintiff's right knee was within normal limits. (Id. at 232.)  X-rays of his lumbar spine revealed "[m]ild dextroscoliosis centered at L3-4 . . . which may be positional" and "very mild biconcave depressions of the endplates at several of the lumbar segments with smooth, rounded cortical margins," "probably old and developmental."  (Id. at 235.)  The findings were otherwise within normal limits.  (Id.)

---

[15]Somatization is "[t]he process by which psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety . . . "  Stedman's Medical Dictionary, 1634 (26th ed. 1995) ,

The third category, Dr. Robbins' office notes, generally consist of Plaintiff's reports of pain and a description of any aggravating factors or occurrences; a listing of his blood pressure, weight, and temperature; his diagnoses, always including lumbar disc disease; and the prescription of medication to relieve Plaintiff's reported symptoms.  The notes begin in December 2005 when Plaintiff reported to Dr. Robbins that his back pain had significantly increased.  (Id. at 227.)  Dr. Robbins elected to change his medication from Lorcet, which had not been effective, to Percocet.[16]  (Id. at 227.)  One week later, Plaintiff informed Dr. Robbins that the Percocet had not helped to relieve his pain, but had made it difficult for him to sleep.  (Id. at 226-27.)  His Medicaid benefits had been terminated and he could not afford any other medications.  (Id. at 226.)  On examination, he had a decreased range of motion.  (Id.)

When Plaintiff next saw Dr. Robbins, on January 6, 2006, he reported that his Medicaid benefits had been restored.  (Id.)  His prescription was changed to OxyContin.  (Id.)  He was also prescribed Ativan and Celebrex.  (Id.)  Plaintiff told Dr. Robbins on January 18 that the OxyContin was helpful, but its affect did not last the expected twelve hours.  (Id. at 225.)  OxyIR was added to his medications.  (Id.)  Plaintiff also reported having "significant mood swings."  (Id.)  Symbyax[17] was added to Plaintiff's medication regimen on January 25 to address his mood swings.  (Id. at 224-25.)

At Plaintiff's February 7 visit, his wife informed Dr. Robbins that Plaintiff's stress, anger management, and mood swings had only minimally improved on the Symbyax.  (Id.

---

[16]Percocet is a combination of oxycodone hydrochloride and acetaminophen and is prescribed for the relief of moderate to severe pain.  PDR at 1096-97.

[17]Symbyax is prescribed for the treatment of depression.  PDR at 1835.

at 224.)  The Symbyax was stopped; Celexa and Zyprexa were started.  (<u>Id.</u>)  Plaintiff's dosage of OxyContin was increased after he saw Dr. Robbins on March 14.  (<u>Id.</u> at 222.) Two weeks later, Plaintiff reported doing better on the OxyContin.  (<u>Id.</u> at 221.)  His pharmacist had not correctly filled his prescription for OxyIR.  (<u>Id.</u>)  On April 26, he reported continuing problems with the pharmacy – problems which Dr. Robbins thought were attributable to insurance complications – and with the OxyContin lasting the full twelve hours.  (<u>Id.</u>)  His prescriptions were renewed.  (<u>Id.</u>)  When Dr. Robbins saw Plaintiff on June 21, he added a prescription for Zelnorm to address Plaintiff's problems with constipation caused by the OxyContin.  (<u>Id.</u> at 220.)  Dr. Robbins noted a few days later that the Zelnorm was not authorized under Plaintiff's insurance.  (<u>Id.</u> at 219.)

Dr. Robbins noted when he saw Plaintiff on July 19 that he was walking with a cane and was "in a real economic crisis" caused by the loss of Medicaid again and by being denied disability.  (<u>Id.</u>)  To try to make ends meet, Plaintiff had been working part-time jobs and was able to do so.  (<u>Id.</u>)  Plaintiff's prescriptions for OxyContin, OxyIR, and Celebrex were renewed on August 16.  (<u>Id.</u> at 218.)  In October, Plaintiff was reportedly getting by on his current dosage of OxyContin "fairly decently."  (<u>Id.</u> at 216.)  He was also prescribed Wellbutrin based on his complaints of having significant stress from problems with his daughter.  (<u>Id.</u>)  Plaintiff reported to Dr. Robbins on December 14 that his pain was recently worse, due, in part, to the weather.  (<u>Id.</u> at 215.)  His dosage of OxyContin was increased from 40 milligrams to 60; his prescription for Ativan was increased from twice a day to thrice a day.  (<u>Id.</u>)  His prescription for Wellbutrin was renewed.  (<u>Id.</u>)

- 9 -

Plaintiff's prescriptions were renewed after his January and February 2007 visits to Dr. Robbins.  (Id. at 214.)

On March 12, Plaintiff reported to Sherri McDonald, the family nurse practitioner in Dr. Robbins' office, that he had right knee pain as a result of a work-related injury.  (Id. at 213.)  When Plaintiff next saw Dr. Robbins, on April 11, arthralgia of the right knee was listed as a diagnosis in addition to his continuing diagnosis of lumbar disc disease.  (Id. at 212.)  Plaintiff was using a crutch when he saw Dr. Robbins on May 16.  (Id. at 211.)  Plaintiff reported having had to spend several hours in bed because mowing his yard had left him in severe pain.  (Id.)  The notes of Plaintiff's June 13 visit to Dr. Robbins list one diagnosis:  lumbar disc disease.  (Id. at 210.)  He was "getting by" on his current dosage of OxyContin.  (Id.)  The notes of Plaintiff's July 11 visit to Dr. Robbins list three diagnoses:  lumbar disc disease, chronic anxiety, and degenerative osteoarthritis.  (Id. at 209.)  He had settled his worker's compensation case, but had "significant finical [sic] woes."  (Id.)  His dosage of OxyContin was increased to 80 milligrams.  (Id.)  On August 8, Plaintiff was reportedly "getting by" on his current OxyContin dosage; his prescriptions for OxyIR, Ativan, and Celebrex were also renewed.  (Id. at 208.)

After seeing Plaintiff on October 3, Dr. Robbins noted that Plaintiff was, in his opinion, permanently disabled and "unable to work in any capacity."  (Id. at 206.)  On October 31, Dr. Robbins indicated that he wanted to prescribe a dosage of Neurontin above 100 milligrams twice a day and was going to contact the agency assisting Plaintiff with obtaining medications to see how to get him a prescription for 600 milligrams twice a day.

- 10 -

(Id. at 205.)  No reference is made in the records of the next visit, on November 27, to any prescription for Neurontin.  (Id. at 204.)  The only prescriptions were for OxyContin, OxyIR, and Wellbutrin.  (Id.)

In addition to the foregoing records of Plaintiff's medical treatment, the ALJ had before him the assessments of examining and nonexamining consultants and of Dr. Robbins.

In January 2008, Dr. Robbins answered a questionnaire submitted to him by the Missouri Section of Disability Determinations.  (Id. at 229-30.)  Asked to describe Plaintiff's "current neurological abnormalities," he listed pain, numbness, and a reduced range of motion.  (Id. at 229.)  Indeed, Plaintiff's range of motion in his lumbar spine and right knee were all significantly reduced.  (Id. at 230.)  Plaintiff had difficulty walking on his toes, heels, and in tandem.  (Id.)  He also had difficulty squatting.  (Id.)  Plaintiff continued to take OxyContin and OxyIR.  (Id. at 229.)

At the request of the Social Security Administration (SSA), Plaintiff was examined in April 2008 by Barry Burchett, M.D.  (Id. at 240-45.)  Dr. Burchett summarized Plaintiff's complaints as follows.

> [Plaintiff] describes an injury at work in 1998 in which he fell and was jerked. The pain has increased over the past few years, and he states he has had constant pain for the past three to four years about the midline from approximately L1-L5.  He states that there is also intermittent pain that is present most of the time in the posterolateral hips.  He also complains of occasional numbness of both great toes, right worse than left.  The back pain can be exacerbated by bending, lifting or sitting for more than 45 minutes, by standing for more than 15 to 20 minutes, or with squatting.  He states that he uses a cane most of the time even inside the house in case there is abrupt lancinating pain that may cause him to fall.  This happens occasionally.  He states that he gets some mild benefit from the use of a TENS unit.  He does not get any benefit from heat.  He states that ice actually causes the pain to be

- 11 -

worse.  He has had physical therapy in the past without benefit.  He states that he has had eight to ten epidural injections.  Initially they seemed to help him, but the last couple did not.  He currently takes OxyContin 100 BID, as well as Neurontin and Celebrex.  The Neurontin seems to provide some mild benefit to him.

[Plaintiff] states that since 2004 he has been having perhaps one episode per week of pressure discomfort that originates in the mid back, and extends into the mild chest area.  The duration of each of these episodes may be ten to 15 minutes.  He sometimes notes associated paresthesias[18] of the right hand. . . . The shortness of breath is often at times associated with the episodes. Relationship to exertion is somewhat vague.

(Id. at 240-41; footnote added.)  Plaintiff's medications included Neurontin, OxyContin, Celebrex, Lorazepam, and Nitrolingual Nitroglycerin.  (Id. at 241.)  Plaintiff walked into the examination room with a cane, but did not use it during the subsequent examination.  (Id.) He "walked with a moderate limping gait favoring the left hip area," and appeared stable at station and comfortable when sitting or lying down.  (Id.)  His appearance, mood, orientation and thinking seemed appropriate.  (Id.)  On examination, he was not short of breath when lying flat.  (Id. at 242.)  There was no swelling, atrophy, redness, warmth, or tenderness in his hands, which could be fully extended.  (Id.)  He could make a fist with both hands.  (Id.) He was able to write and pick up coins with either hand and without difficulty.  (Id.)  There was no swelling, redness, warmth, tenderness, fluid, laxity, or crepitus in his knees, ankles, or feet.  (Id.)  His dorsolumbar spine had a normal curvature and no evidence of paravertebral muscle spasm.  (Id. at 243.)  There was no swelling, redness, warmth, tenderness, or crepitus

---

[18]Paresthesia is "[a]n abnormal sensation, such as of burning, pricking, tickling, or tingling." Stedman's at 1300.

- 12 -

in his hips.  (Id.)  Straight leg raises were positive[19] bilaterally in the supine position at 90

degrees.  (Id.)  Plaintiff complained of subjective degenerative tenderness in his lumbar area

and declined to try to stand on one leg at a time, to walk on his toes or heels, or walk with a

tandem gait.  (Id.)  His legs were of equal length.  (Id.)  He squatted to only 20 degrees of

knee because of complaints of low back pain.  (Id.)  His cerebellar function was intact and

his sensory modalities were well preserved.  (Id.)  Dr. Burchett's impression was of chronic

low back pain due to probable degenerative disc disease of the lumbar spine; possible

coronary angina; and hypertension.[20]  (Id.)  Dr. Burchett described Plaintiff's effort when

testing his range of motion in his upper and lower extremities as "poor."  (Id. at 244.)  In his

lumbar spine, he had flexion to 70 degrees – normal was between 0 and 90.  (Id. at 245.)

In May 2008, a Physical Residual Functional Capacity Assessment (PRFCA) of

Plaintiff was completed by Amy Swain, who was a "single decision-maker"[21] and not a

medical consultant.  (Id. at 262-68.)  The primary diagnosis was degenerative disc disease;

the secondary diagnosis was hypertension.  (Id. at 262.)  These impairments resulted in

exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds;

---

[19]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

[20]His blood pressure had been 130/100.  (Id. at 241.)  His weight was 279 pounds.  (Id.)

[21]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

frequently lift or carry twenty-five pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day.  (Id. at 263.)  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 264-66.)

The same month, a Psychiatric Review Technique form (PRTF) was completed for Plaintiff by Marshal Tool, Psy.D.  (Id. at 269-79.)  Plaintiff was described as having an affective disorder, i.e., depression, and an anxiety-related disorder, i.e., anxiety.  (Id. at 269, 272, 273.)  These disorders resulted in Plaintiff having mild difficulties in maintaining concentration, persistence, or pace, but in no restrictions of activities of daily living and no difficulties in maintaining social functioning.  (Id. at 277.)  It did not cause any episodes of decompensation of extended duration.  (Id.)

Pursuant to his applications, Plaintiff was evaluated in August 2009 by Annamaria Guidos, M.D.  (Id. at 282-95.)  Plaintiff reported that he had not worked since November 2007.  (Id. at 282.)  He had low back pain radiating to his thighs; the pain was aggravated by sitting, standing, bending, lifting, walking, coughing, or sneezing.  (Id.) Physical therapy, bed rest, and spinal injections had not helped.  (Id.)  He could independently "perform [a]ctivities of [d]aily [l]iving."  (Id.)  His medications included Cymbalta, Celebrex, Neurontin, OxyContin, hydrocodone-acetaminophen, and Lorazepam.  (Id. at 283.)  He also had bilateral knee pain.  (Id. at 284.)  He walked with a slight limp and used a cane.  (Id.)  The range of motion in his lumbar spine "could not be adequately determined secondary to limited effort on testing." (Id. at 283, 289.)  He had normal muscle strength, bulk, and tone in his upper and lower extremities.  (Id. at 285.)  His reflexes in his upper and lower extremities were 2+ and

symmetrical.  (Id.)  His sitting straight leg raises were negative.  (Id.)  His straight leg raises

from a lying down position "could not be determined accurately secondary to lack of effort."

(Id. at 285, 289.)  Dr. Guidos assessed Plaintiff as being able to frequently lift and carry up

to twenty pounds; occasionally lift and carry up to forty pounds; sit, stand, and walk for two

hours each without interruption; sit, stand, or walk for a total of eight hours in an eight-hour

work day; only occasionally balance, stoop, and crouch; and never kneel, crawl, or climb

ladders or scaffolds.  (Id. at 290-91, 293.)  Plaintiff should never be exposed to unprotected

heights; only occasionally be exposed to moving mechanical parts and operating a motor

vehicle; and no more frequently than two-thirds of the time be exposed to humidity, wetness,

dust, odors, fumes, other pulmonary irritants, extreme cold or heat, and vibrations.  (Id. at

294.)  Plaintiff could engage in such activities as shopping, walking a block at a reasonable

pace on rough or uneven surfaces, preparing a simple meal, and walking without using a

wheelchair, walker, two canes, or two crutches.  (Id. at 295.)

        The same  month, Plaintiff underwent a psychological evaluation by Paul W. Rexroat,

Ph.D.  (Id. at 297-99, 301-04.)  Plaintiff drove to the examination.  (Id. at 302.)  "He was

adequately dressed and groomed . . . [and] was not suspicious, anxious, tense, or weepy."

(Id.)  He had "a normal range of emotional responsiveness and a normal affect."  (Id.)  He

was alert and cooperative.  (Id.)  "He wore a back brace and could walk well enough, but he

had a cane which he basically carried."  (Id.)  "His speech was normal, coherent, and relevant,

with no evidence of flight of ideas or loosening of associations or other abnormalities of

speech . . . ."  (Id.)  He did not have unusual mood swings.  (Id.)  He was unhappy, but not

anxious.  (Id.)  He was irritable and withdrawn.  (Id.)  He had trouble staying asleep due to discomfort.  (Id.)  Plaintiff reported that his primary care physician prescribed Cymbalta and Lorazepam for his mood problems; the medications helped.  (Id.)  "He was well oriented for person, place, time, and situation," with the exception of thinking the day of the month was the fourth when it was the fifth.  (Id.)  His immediate, recent, and remote memories were fine. (Id. at 302-03.)  He could quickly solve simple arithmetic problems and recognize similarities and differences.  (Id. at 303.)  His intelligence was estimated to be in the low average range, although "he described significant symptoms of dysthymia."[22]  (Id.)  He could understand and remember simple instructions; sustain concentration and persistence with simple tasks; interact socially; and adapt to his environment.  (Id.)  He lived with his wife, who worked, and a child.  (Id.)  He occasionally makes supper, does the laundry daily, goes shopping, and drives a car.  (Id.)  Dr. Rexroat noted that there appeared to be few limitations in Plaintiff's activities of daily living.  (Id.)  He reportedly got along well with other people.  (Id.)  There appeared to be few limitations in the area of social functioning.  (Id.)  Dr. Rexroat's diagnosis was dysthymia, or depression.  (Id. at 304.)  He rated Plaintiff's current Global Assessment of Functioning as being 65.[23]  (Id.)

_____

[22]Dysthymia is chronic depression.  See Stedman's at 536.

[23]"According to the *Diagnostic and Statistical Manual of Medical Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-

- 16 -

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Rexroat rated Plaintiff's mental impairment as having no affect on his ability to understand, remember, and carry out instructions.  (Id. at 297.)  His impairment did have a mild affect on his ability to interact appropriately with supervisors, co-workers, and the public and to respond to changes in the routine work setting.  (Id. at 298.)  No other capabilities were affected by his impairment.  (Id.)

Following the receipt of the reports of the consultative examinations, the ALJ informed Plaintiff that he had the right to request a supplemental hearing, at which Plaintiff could "appear, testify, produce witnesses, and submit additional evidence and written or oral statements . . . ."  (Id. at 184-85.)  If Plaintiff did request a hearing, his request would be granted unless the ALJ could determine without a hearing that his applications should be granted.  (Id. at 184.)  The ALJ further informed Plaintiff that, if he did not hear from Plaintiff within ten days, he would assume that Plaintiff did not wish a supplemental hearing, to submit additional records or statements, or the question the authors of the enclosed reports.  (Id. at 185.)

After the hearing, the ALJ submitted interrogatories to Brenda Young, M.A., to be answered in her capacity as a vocational expert (VE).  (Id. at 186-90.)  Asked to classify jobs Plaintiff had performed in the past fifteen years in terms of their exertional and skill requirements, Ms. Young responded that his job as a maintenance man and cleaner was medium and unskilled; as a material handler was heavy and unskilled, as was his job as a

---

TR at 34 (emphasis omitted).

sand blaster; and as an insurance salesman was semi-skilled and light.  (Id. at 194.)  Because

of his job as an insurance salesman, Plaintiff would have transferable skills of knowledge of

product, ability to speak persuasively to customers, and an ability to keep accurate records.

(Id.)  One interrogatory described the following hypothetical person:

> Assume a person age 49 with a [high school] education . . . and has past work
> experience you identified.  Assume a person capable of performing the
> [e]xertion demands of a (wide) range of light work[24] as defined in Social
> Security Regulations.  Also, assume the person can: [l]ift/[c]arry/[p]ush/[p]ull
> 40 lbs. occasionally and 20 lbs. frequently.  Sit (with normal breaks) for a total
> of 8 hours a day.  Stand (with normal breaks) for a total of 8 hours a day, and
> [w]alk (with normal breaks) for a total of 8 hours a day.

(Id.)  This hypothetical person was also limited to occasional crouching, stooping, and

balancing and was prohibited from kneeling, crawling, exposure to hazards, and climbing

ladders and scaffolds.  (Id.)  The VE responded that this hypothetical person could perform

Plaintiff's past work as an insurance salesman if it was limited to inside sales.  (Id. at 195.)

His transferable skills would be applicable only to the insurance salesman position.  (Id.)  The

hypothetical person would be able to perform the occupations of retail salesperson, janitor,

and file clerk.  (Id.)  The first two jobs were unskilled and light.  (Id.)  The last was semi-

skilled and light.  (Id.)  All three existed in significant numbers in the local economy.  (Id.)

Her response differed from the *Dictionary of Occupational Titles* (DOT) in that the DOT

listed all janitorial positions as heavy; however, positions cleaning offices were performed

---

[24]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

in the work force at the light level.  (Id.)  The file clerk position was listed in the DOT as semis-skilled; however, it was usually learned within thirty days.  (Id.)

The ALJ sent Ms. Young's interrogatory answers to Plaintiff and informed him that he could request a supplemental hearing and request that subpoenas be issued for the attendance of witnesses or the submission of records at that hearing.  (Id. at 196-97.)  As before, the ALJ also advised Plaintiff that if he did not hear from him in ten days he would assume that he did not wish to request a supplemental hearing, to submit any written statements or records, or to question the VE.  (Id. at 197.)

The ALJ also had before him the report of an investigation of Plaintiff by an SSA detective.  (Id. at 247-61.)  The May 2008 investigation was requested due to (a) inconsistencies between his complaints of debilitating back pain and the lack of supporting objective medical evidence and (b) a concern by Dr. Schafer that there was"'an element of some somatization going on'" based on Plaintiff's "monthly prescriptions for very large doses of narcotic pain killers." (Id. at 247.)  After being unable to locate Plaintiff at either address on file, the detective traced Plaintiff's home telephone number to an address in a different town.  (Id. at 250.)  At this address, there was a 1.5 story brick home with at least three bedrooms, a two-car attached garage, and a shop next to the garage.  (Id.)  "The home appeared to be well-kept, in good condition; the yard was mowed and maintained properly." (Id.)  One of Plaintiff's cars was marked in the driveway.  (Id.)  There were no observable ramps or handrails at any of the residence's entrances.  (Id. at 253.)  The detective observed Plaintiff as he left the consultative examination, noting that he wore a back brace, used a cane

in his right hand, walked without other assistance but with a significant limp, had a slightly "wobblely" or odd movement of his head and neck, and backed into the passenger seat of his mother's sports utility vehicle (SUV) "with apparent difficulty." (Id. at 250.) The detective followed Plaintiff and his mother as they made several stops, noting that Plaintiff's walking and movement improved with each stop. (Id. at 250-51.) At one stop, Plaintiff walked around a store for approximately twenty minutes with no apparent difficulty, with the exception of using the cane, and without resting or appearing to be in pain or tired. (Id. at 251.) At the next stop, Plaintiff got out of his mother's SUV without assistance, did not exhibit any difficulty aside from using the cane, did not appear to be in pain or discomfort, did not move in a guarded manner, and got into the SUV without any difficulty other than trying to get his cane into the front area. (Id.) The next day, the detective found Plaintiff at a convenience store where his wife apparently worked. (Id.) He walked into the store as Plaintiff walked out. (Id.) Plaintiff was wearing the brace he had worn at the consultative examination, but was not using a cane. (Id.) He was walking with a normal pace and without a limp. (Id.) The detective followed Plaintiff to a church, where he observed Plaintiff painting a front door. (Id. at 251-52.) At one point, when getting some items out of his SUV, he appeared to be bent over at the waist and almost parallel to the ground. (Id. at 252.) He bent over without any hesitation and any indication of pain or discomfort. (Id.) He moved about with no apparent difficulty or discomfort, did not limp, and did not use an assistive device. (Id.) He worked inside the church for at least two hours. (Id.) Plaintiff returned to the church the next day; however, the detective was unable to see him because he parked

inside a building.  (Id.)  The detective, having read Plaintiff's medical records, also noted in his report that "[t]here are multiple times that the doctor writes multiple prescriptions for narcotics as [Plaintiff] complains that the mail order drug program has made mistakes on his deliveries."  (Id. at 257.)

## The ALJ's Decision

The ALJ first noted that Plaintiff's prior DIB and SSI applications also alleging a disability onset date of August 2, 2003, had been denied following a hearing.  (Id. at 10.)  The denial had been affirmed on June 8, 2006, by the Appeals Council.  (Id.)

Next, the ALJ evaluated Plaintiff's applications under the Commissioner's five-step procedure, finding at step one that Plaintiff met the insured status requirements of the Act through September 30, 2011, and had not engaged in substantial gainful activity since his August 2003 alleged disability onset date.  (Id. at 12-13.)

At step two, the ALJ found that Plaintiff had severe impairments of status post minimal tear of the posterior horn of the lateral meniscus of the right knee; osteoarthritis; and degenerative disc disease of the lumbar spine.  (Id. at 13.)  His hypertension, left wrist injury, and mild obesity were not severe.  (Id. at 13-14.)  Also not severe was Plaintiff's depression.  (Id. at 14-15.)  Although he had alleged depression and had been prescribed medication that had improved his mood, he had never sought, received, or been referred to a psychologist or psychiatrist or any other mental health professional; had had no serious deterioration in his functioning as a result of a mental impairment; had not appeared at the hearing to have any obvious signs of a mental impairment; had only mild limitations in his activities of daily

- 21 -

living and in his concentration, persistence, or pace; and had no limitations in social functioning.  (Id.)  Additionally, Dr. Rexroat's assessment of a GAF of 65 suggested no more than mild limitations in functioning.  (Id. at 14.)

At step three, the ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or equal an impairment of listing-level severity.  (Id. at 15.)

Plaintiff had, the ALJ concluded, the residual functional capacity (RFC) to perform light work with the ability to lift, carry, push, and pull forty pounds occasionally and twenty pounds frequently; to sit, stand, and walk, with normal breaks, for a total of eight hours a day; to climb ramps and stairs; to reach, handle, and finger; and to only occasionally balance, stoop, and crouch.  (Id.)  Plaintiff was not to crawl; kneel; climb ladders, ropes, or scaffolds; and be exposed to hazards, including moving machinery and unprotected heights.  (Id.)

When assessing Plaintiff's RFC, the ALJ summarized, in detail, the record before him and evaluated Plaintiff's credibility.  (Id. at 16-19.)  He noted that no "specific event, medical or otherwise," had occurred on Plaintiff's alleged disability onset date and that Plaintiff had worked through November 2007.  (Id. at 18.)  To the extent that Plaintiff's daily activities were restricted, they were restricted by Plaintiff's choice and "not by any apparent medical proscription."  (Id.)  "No treating or examining physician, even Dr. Robbins, ha[d] placed any specific long-term limitations on [Plaintiff's] abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities."  (Id.)  Moreover, Plaintiff was seen shopping without difficulty, walking without limping, and painting a door with bending and stooping without difficulty.  (Id.)  He had no recent surgery or hospitalization; no physical therapy since

January 2005, when he had only an initial evaluation; and no treatment from a pain specialist. (Id.)  There was no evidence that his nonexertional pain had seriously interfered with his ability to concentrate.  (Id.)  Although he had testified that he stumbled and fell a lot and had come to  the hearing site in a wheelchair, there was no evidence of complaints about the former and no evidence that his condition required the regular use of a wheelchair.  (Id.) Indeed, there was evidence that even the use of the cane did not appear to be needed.  (Id.) Plaintiff did not  have many of the signs indicative of chronic, severe musculoskeletal pain, e.g., muscle atrophy or spasms, but did walk in and out of the hearing room without difficulty.  (Id. at 18-19.)  And, although the opinion of a treating and examining physician is entitled to great weight, Dr. Robbins' opinion was not supported by the evidence as a whole, was based on Plaintiff's subjective complaints, and, to the extent that Dr. Robbins opined that Plaintiff was unable to work, invaded the province of the Commissioner.[25]  (Id. at 19.)

The ALJ then found, at step four, that with his RFC, Plaintiff could return to his past relevant work as an insurance salesman.  (Id. at 20.)  According to the VE's responses, with his RFC, age, education, work experience, and transferable skills, Plaintiff could also perform other jobs that existed in significant numbers in the local economy.  (Id. at 21.)

For the foregoing reasons, Plaintiff was not disabled within the meaning of the Act. (Id.)

## Additional Records Before the Appeals Council

_____

[25]The ALJ also considered, but discounted, evidence from Plaintiff's wife.

After the ALJ rendered his adverse decision, additional records of Dr. Robbins were submitted to the Appeals Council.  These records are described below.

Plaintiff reported to Ms. McDonald on December 18, 2007, that he was continuing to have pain; his wife reported that he slept all the time.  (Id. at 334.)  Plaintiff requested that his OxyContin dosage be increased, which it was to 100 milligrams.[26]  (Id.)  Plaintiff's medications were refilled on January 10, 2008.  (Id. at 333.)  Eight days later, he went to Dr. Robbins' office, explaining that his mail-order prescription for OxyContin had been delayed and that his medication would run out that day.  (Id.)  He was given a prescription for six days of OxyContin in addition to the thirty-day prescription mailed in.  (Id.)  On February 7, Plaintiff reported to Ms. McDonald that he was in a lot of pain and needed a refill of his prescriptions.  (Id. at 332.)  One was given.  (Id.)  One week later, he reported another "foul up" with the prescription assistance program.  (Id. at 331-32.)  Ms. McDonald noted that Plaintiff had faxed to the program the last week a prescription for a month supply of OxyContin.  (Id. at 331.)  She further noted that the program did not appear to be concerned about the length of time it took them to fill a needed prescription.  (Id.)  Plaintiff was given a ten-day prescription for OxyContin.  (Id.)

Plaintiff's OxyContin and other prescriptions were renewed after Plaintiff was seen on March 6.  (Id. at 330.)  On March 14, Plaintiff reported that there had been another delay in receiving his mail-order prescription.  (Id.)  He was given a prescription for a one week supply of OxyContin.  (Id.)  When Dr. Robbins saw Plaintiff on April 1, he changed the

---

[26]See note 7, supra.

- 24 -

dosage amounts of the OxyContin capsules, e.g., 40 milligram doses twice a day and two 10 milligrams twice a day rather than one 100 milligram dose once a day, in an effort to facilitate the mail-order filling of Plaintiff's prescription.  (Id. at 329.)

After Plaintiff complained of significant pain without substantial relief from his current dosage of OxyContin, Dr. Robbins increased the amount to 120 milligrams.  (Id. at 328.)  Three days later, Plaintiff complained of not receiving his mail-order OxyContin prescription; he was given a week's supply.  (Id.)  On June 30, Plaintiff reported having "inadvertently dumped his short term supply" of OxyContin; another was given for four days. (Id. at 327.)  On August 21, Plaintiff complained of chronic pain and emotional problems caused by his two daughters who did not "like his health status."  (Id. at 326.)   His prescriptions were renewed.  (Id.)  Four days later, he was given a short-term supply of OxyContin.  (Id.)

Dr. Robbins noted at Plaintiff's September 18 visit the continuing problems with Plaintiff getting a reliable supply of OxyContin from the drug assistance program and with the related repeated issuance of short-term scripts for the drug when there was a delay in Plaintiff receiving the prescription.  (Id. at 325.) Dr. Robbins also noted the need for Plaintiff to have a neurosurgeon evaluate him, and the uncertainty caused by Plaintiff's financial situation in receiving that evaluation.  (Id.)

The issuance of a short-term script was necessary at Plaintiff's October 14 visit.  (Id. at 324.)   At that visit, Plaintiff showed Dr. Robbins six OxyIR capsules that had no medication in them.  (Id.)  Dr. Robbins noted that the only people or entities handling

- 25 -

Plaintiff's mail-order prescriptions were the manufacturer, FedEx, and Plaintiff and lamented the continuing problems Plaintiff was having getting timely and accurately-filled prescriptions. (Id.) After his November visit, Plaintiff's dosage of OxyContin was increased to 160 milligrams. (Id. at 323.)

Dr. Robbins or Ms. McDonald continued to see Plaintiff every month. (Id. at 305-22.) The notes of the most recent visit before the Appeals Council are dated July 6, 2010. (Id. at 305.)

The pattern of Plaintiff reporting some improvement in his pain when his OxyContin dose was increased, see, e.g., December 2008 visit notes, id. at 322, then plateauing and needing an increase dose, see, e.g., April 2009 notes increasing dosage to 200 milligrams, is repeated in the twenty-two visits represented by the submitted records. (Id. at 305-22.) Also repeated are Plaintiff's reports of continuing problems getting the correct amount timely received through the mail, see, e.g., July 2010 notes reporting that prescription had gotten lost in mail, and Dr. Robbins' prescribing a limited amount of OxyContin to tide Plaintiff over until the problem was resolved, see, e.g., July 2010 notation of a ten-day prescription. (Id.) Twice Dr. Robbins issued additional prescriptions for OxyContin when Plaintiff's medication was stolen. (Id. at 311-13.) Dr. Robbins' notes also report a concern that the manufacturer would not mail the increased dosage of OxyContin to a post-office box and the consequent substitution of a street address.[27] (Id. at 309-10.) There are several references in Dr. Robbins' notes to Plaintiff using a cane and one reference, in May 2009, to him using a wheelchair.

---

[27]The street address was the same address that the detective found to be Plaintiff's place of residence.

(See id. at 306-07, 318, 320.)  A rare reference is made in the office notes of June 2010 to Plaintiff's gait; it was described then as "very fragile."  (Id. at 306-07.)

In July 2010, Dr. Robbins completed a Medical Source Statement on behalf of Plaintiff.  (Id. at 335-41.)  He listed his diagnoses as lumbar disc disease accompanied by severe pain and depression.  (Id. at 335.)  These impairments caused pain, a decreased range of motion, weakness, and poor balance.  (Id.)  The objective signs of such pain were joint instability, reduced grip strength, sensory changes, impaired sleep, abnormal posture, tenderness, trigger points, abnormal gait, a positive straight leg raising test, and muscle spasm and weakness.  (Id.)  Depression, somatoform disorder, and anxiety affected Plaintiff's pain, which was constant.  (Id. at 336.)  Plaintiff could not continuously sit for longer than fifteen minutes before having to walk about, could not stand or walk for longer than fifteen minutes, could not stand or walk continuously for longer than fifteen minutes before having to lie down, and could not spend longer than an hour total during an eight-hour day doing a combination of sitting, standing, or walking.  (Id. at 336-37.)  To relieve his pain, Plaintiff would need to rest at least six hours during an eight-hour work day.  (Id. at 338.)  He should never balance or lift or carry as much as one pound.  (Id. at 339.)  He should only occasionally forward flex, backward flex, or rotate his neck.  (Id.)  He should only occasionally reach, handle, or grasp.  (Id. at 339-40.)  He needed to use a cane to walk or stand.  (Id. at 340.)  Because of his pain, Plaintiff would need to be absent from work at least three times a month.  (Id. at 341.)  He would never have a "good day."  (Id.)

**Legal Standards**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.  Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006).  Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ."  **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir.

- 28 -

2007).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).  "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the

ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting

Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

   In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.

**Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d

1211, 1217 (8th Cir. 2002)).   This evaluation requires that the ALJ consider "'(1) the

claimant's daily activities; (2) the duration, intensity, and frequency, and intensity of the pain;

(3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects

of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the

absence of objective medical evidence to support the claimant's complaints.'"  **Buckner v.**

**Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited

Polaski v. Heckler, 739 F.2d 1320,  1322 (8th Cir. 1984)).   "'The credibility of a claimant's

subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Wagner**, 499 F.3d

at 851 (quoting Pearsall, 274 F.3d at 1218).   After considering the Polaski factors, the ALJ

must make express credibility determinations and set forth the inconsistencies in the record

which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452

(8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

   At step four, the ALJ determines whether claimant can return to his past relevant work,

"review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).   The burden at step

four remains with the claimant to prove his RFC and establish that he cannot return to his past

relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different

- 31 -

conclusion," **Wiese**, 552 F.3d at 730.  "If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by failing to (1) hold a supplemental hearing after representing at the initial hearing that a supplemental hearing would be held and (2) develop the record on his mental condition.[28]  The Commissioner disagrees.[29]

Plaintiff correctly notes that the ALJ informed him at the end of the hearing that a supplemental hearing would be held after he received the reports of the consultative examinations.  No such hearing was held.  Plaintiff was also twice informed, however, that one would be held if he requested it.  He does not allege that he did.

In support of his argument, Plaintiff forthrightly states that the only case he found in support was **Yount v. Barnhart**, 416 F.3d 1233 (10th Cir. 2005).  In that case, as in the instant case, at the end of the administrative hearing, the ALJ ordered a consultative

---

[28]Plaintiff does not challenge the ALJ's adverse credibility determination.  Were he to do so, the Court would find the challenge to be without merit for the reasons set forth in the Commissioner's brief in support of his answer.  (See Def. Br. at 8-12, ECF No. 14.)

[29]The Commissioner also notes that "the relevant time period for consideration of Plaintiff's claims begins on June 9, 2006, the date after the last final denial of his previous claims."  (Def. Br. at 3 n.1.)

examination of the claimant.  **Id.** at 1234.  After the examination, the ALJ notified the claimant of his intent to enter the resulting report in the record and informed him "that, in response to th[e] additional evidence, [the claimant] could either submit written comments or questions, or request a supplemental hearing."  **Id.**  Claimant's counsel requested a supplemental hearing; however, the ALJ did not respond to the request.  **Id.**  No supplemental hearing was held.  **Id.**  Concluding that the claimant had to have stated what facts he expected to prove at a supplemental hearing and explain why those facts could not be otherwise proven, the district court rejected the claimant's argument that the failure to hold a supplemental hearing violated his due process rights.  **Id.** at 1235.  The appellate court disagreed, holding that under the circumstances before it, claimant was denied due process.

Because Plaintiff did not request a supplemental hearing after twice being informed of his right to do so, any error in not holding one must arise from either (a) the ALJ's hearing statement that one would be held or (b) the imposition of a requirement that a supplemental hearing be held after consultative examinations are conducted regardless of the claimant's failure to request one.  Any reliance on the former is unavailing given that the ALJ twice clearly informed Plaintiff after the hearing that he would assume Plaintiff did not wish a supplemental hearing if he did not hear from Plaintiff within ten days.  See **Gomilla-Levy v. Astrue**, 2009 WL 426455, *11 (E.D. Mo. Feb. 19, 2009) (finding that ALJ did not violate claimant's due process rights by not holding a supplemental hearing when request had been made "well beyond the ten days allowed" and no request for an extension of time had been made).

- 33 -

Any reliance on the second is unavailing given the lack of any due process requirement that a claimant has the absolute right to cross-exam an examining physician or VE regardless of whether a request to do so has been made.

> "[A] written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing, and despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, *when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.*"

**Passmore v. Astrue**, 533 F.3d 658, 661 (8th Cir. 2008) (quoting Richardson v. Perales, 402 U.S. 389, 402 (1971)) (emphasis in quoting source).  See also **Coffin v. Sullivan**, 895 F.2d 1206, 1211-12 (8th Cir. 1990) (holding that due process requires only that a claimant be *allowed* to cross-examine VE, not that there is a right to cross-exam which cannot be waived regardless of the claimant's failure to request such an opportunity).

Plaintiff next argues that the ALJ erred by not eliciting testimony from him about the severity of his mental condition.

"'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)).  In order for a case to be remanded for additional testimony, however, a claimant must establish that an ALJ's failure to fully develop the record caused him prejudice. **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005).  Plaintiff cannot establish such

prejudice.  As noted by the ALJ, there are no records of Plaintiff seeking treatment for his mental condition by a mental health professional.  The only record by such a professional is the report of Dr. Rexroat's consultative examination.  There are references in Dr. Robbins' notes to Plaintiff's psychological complaints and to his prescription of various medications to address such complaints based only those complaints.  The ALJ, however, found Plaintiff not to be credible – a finding Plaintiff does not now challenge.  Thus, Plaintiff cannot show prejudice from the ALJ's failure to elicit testimony from him about his mental condition given that the ALJ considered his testimony not to be credible.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently."  **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  17th  day of September, 2012.